**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| WALTER DEMMONS and KIRK RAMSAY, on behalf of themselves and all others similarly situated, | ) <br> ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | ) Docket No. 1:22-cv-00305-NT |
| | ) |
| ND OTM LLC, | ) <br> ) |
| Defendant. | ) <br> ) |

**ORDER ON DEFENDANT'S PARTIAL MOTION TO DISMISS**

Before me is Defendant ND OTM LLC's Motion to Dismiss (ECF No. 11) Counts I and II of the Complaint. For the reasons stated below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

**FACTUAL BACKGROUND**[1]

The Defendant, ND OTM LLC ("**ND OTM**"), operates a paper pulp mill in Old Town, Maine. Class Action Compl. ¶ 1 ("**Compl.**") (ECF No. 1). The mill produces unbleached softwood kraft pulp through a process that involves breaking down wood chips using heat, chemical treatment, and water. Compl. ¶ 21. This process emits total reduced sulfur ("**TRS**") and sulfur dioxide. Compl. ¶¶ 22, 57. These chemicals produce a characteristic rotten egg smell, which can impact the surrounding area if the mill does not use proper mitigation techniques involving venting and pressure controls. Compl. ¶¶ 22, 57–58. Additionally, one of the

---

[1]     The facts below are drawn from the allegations in the Complaint, which I take as true for the purposes of deciding a motion to dismiss. *See Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

byproducts of the pulp-making process is a waste sludge that is processed in an aerated lagoon for wastewater treatment. Compl. ¶ 23. This sludge also produces a noxious odor when the lagoon is not properly maintained. Compl. ¶ 24.

The Plaintiffs allege that ND OTM has failed to properly maintain and operate the mill since it began producing paper pulp in 2018.[2] Compl. ¶¶ 20, 24–25, 41–43, 59, 81. Consequently, on numerous and distinct occasions, the mill has discharged offensive odors into the private residential properties and public lands in its vicinity. Compl. ¶¶ 16–19, 25, 35, 42, 59–61, 65–66, 69, 82–84. More than 120 residents have reported being affected. Compl. ¶ 26. The foul odors have interfered with the ability of those who live in the area to use and enjoy their property. Compl. ¶¶ 36–37. The situation has also resulted in the diminution of property values. Compl. ¶ 37.

The unhappy neighbors have brought the smells to the attention of ND OTM and Maine's environmental protection agency. Compl. ¶ 32. The Maine Department of Environmental Protection (the "**DEP**") Non-Compliance Review Board (the "**Board**") has consistently received community complaints about the "harsh rotten-egg" smell.[3] Compl. ¶ 32(a). At a meeting in February of 2021, the Board noted that they spoke with the mill about the complaints and that the mill "also believe[s] that the odors are from the mill (methanol odors are very strong) and have themselves documented the odors from some distance away." Compl. ¶ 32(b). Early in 2021, ND

---

[2]     Prior to ND OTM's 2018 purchase of the mill, the mill had been idle since 2015. Class Action Compl. ¶ 20 ("**Compl.**") (ECF No. 1).

[3]     In addition, the Maine Department of Environmental Protection (the "**DEP**") Bureau of Air Quality has received at least fifty distinct complaints about the odor since 2020. Compl. ¶ 32(c).

OTM created a link on their website to accept community complaints. Compl. ¶ 32(d). Still, the smells have continued. Compl. ¶ 33.

Beyond affecting owners and occupants in the area, the smells have also impacted the general public. Compl. ¶ 40. Penobscot County, where the mill is located, is home to a wide range of commercial and recreational activities, such as dining, industry, construction, retail, lodging, ministry, and education. Compl. ¶ 38. Members of the public, including tourists, students, and customers, have been harmed by the noxious odors in public spaces. Compl. ¶ 40.

The named Plaintiffs, Walter Demmons and Kirk Ramsay, are two homeowners living within two-and-a-half miles of the mill who have experienced the odors. Compl. ¶¶ 17, 28, 30.  Demmons reports that "the odor is very strong" and he "can't open the windows or go for . . . walks." Compl. ¶ 29. Ramsay reports that "it's embarrassing to have people in our home, the mill is causing it to smell SO bad. We've lived here for 36 years and its [sic] never smelled so bad." Compl. ¶ 31.

Demmons and Ramsay bring this action individually and on behalf of "all owner/occupants and renters of residential property residing within two and a half miles (2.5) of the Facility's property boundary since October 19, 2018."[4] Compl. ¶ 44. This amounts to over 5,900 housing units. Compl. ¶ 45. All purported class members have suffered the same injury to their property values and their ability to

---

[4]       The Plaintiffs have not yet moved for class certification. While neither party raises the issue, I note that Rule 23(c) of the Federal Rules of Civil Procedure speaks of certifying the class "[a]t an early practicable time." Fed. R. Civ. P. 23(c)(1)(A). "The word 'practicable' imports some leeway in determining the timing of such a decision," *Danny B. ex rel. Elliott v. Raimondo*, 784 F.3d 825, 837 (1st Cir. 2015), and a court may defer a decision on class certification until after deciding a Rule 12(b)(6) motion, *see In re Wayfair, Inc. Secs. Litig.*, 471 F. Supp. 3d 332, 337–38 (D. Mass. 2020). Following the parties' lead, I consider the motion to dismiss now, irrespective of class treatment.

use and enjoy their property resulting from ND OTM's failure to properly maintain or operate the mill. Compl. ¶¶ 49–50. This is distinct from members of the public who have not suffered diminished property values and loss of the use and enjoyment of private property. Compl. ¶¶ 40, 70.

Demmons and Ramsay bring three claims on behalf of the putative class against ND OTM. In Count I, they allege that the Defendant's odor emissions constitute a public and private nuisance under the common law and Sections 2701 and 2802 of Maine's nuisance statutes. Compl. ¶¶ 54–72. Count II is a claim for trespass. Compl. ¶¶ 73–77. In Count III, they contend that ND OTM was negligent in maintaining and operating its mill and in failing to manage, treat, mitigate, and/or control the odors it created. Compl. ¶¶ 78–84.

Now, ND OTM moves to dismiss Counts I and II for nuisance and trespass, respectively. Def. ND OTM LLC's Partial Mot. to Dismiss Compl. 2 ("**Def.'s Mot.**") (ECF No. 11). The Plaintiffs consent to the dismissal of the trespass claim. Pls.' Resp. to Def.'s Partial Mot. to Dismiss ("**Pls.' Resp.**") 1 n.1 (ECF No. 14). As a result, Count II is **DISMISSED**, and I only consider whether the Plaintiffs have stated a claim for nuisance.

## LEGAL STANDARD

"To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), 'a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief,' with 'enough factual detail to make the asserted claim plausible on its face.' " *Legal Sea Foods, LLC v. Strathmore Ins.*

*Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (quoting *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015)). This is a "make-or-break standard." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plausible" means "more than merely possible." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)). While I take as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor, I do not credit "conclusory legal allegations" or "factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods*, 36 F.4th at 33–34 (1st Cir. 2022) (citations and internal quotation marks omitted).

## DISCUSSION

The Defendant argues that the Plaintiffs' public and private nuisance claims are barred because Maine has established comprehensive regulations controlling TRS emissions from kraft pulp mills, and Maine's air pollution law limits the ability of private plaintiffs to bring tort suits involving air quality. Def.'s Mot. 8. ND OTM contends that the Plaintiffs' public nuisance claim fails for the additional reason that they have not suffered a special injury as is required for private plaintiffs to bring a public nuisance suit. Def.'s Mot. 8. I address these arguments below, after laying out the general contours of nuisance law and air pollution regulations.

5

## I.    Nuisance Law

The Plaintiffs bring their claims under Maine law, which recognizes both common law and statutory claims for nuisances.

### A.    Common Law Nuisance

There are two types of common law nuisance claims—private and public. Restatement (Second) of Torts § 821A (1979).[5] "A private nuisance 'consists in a use of one's own property in such a manner as to cause injury to the property, or other right, or interest of another.' " *Johnston v. Me. Energy Recovery Co., Ltd. P'ship*, 2010 ME 52, ¶ 15, 997 A.2d 741 (Me. 2010) (quoting *Norcross v. Thoms*, 51 Me. 503, 505 (1863)); *see also* Restatement (Second) of Torts § 821D. To establish a common law private nuisance claim, the plaintiff must show that:

> (1) "the defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use" with intent meaning only that "the defendant has created or continued the condition causing the interference with full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow"; (2) there was some interference of the kind intended; (3) the interference was substantial such that it caused a reduction in the value of the land; and (4) the interference "was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land."

*Johnston,* 2010 ME 52, ¶ 15, 997 A.2d 741 (quoting *Charlton v. Town of Oxford*, 2001 ME 104, ¶¶ 36 & 37 n.11, 774 A.2d 366).

A public nuisance claim involves "an unreasonable interference with a right common to the general public." *St. Hilaire v. City of Auburn*, No. AP-02-023, 2003 WL 21911064, at *4 n.5 (Me. Super. Ct. June 12, 2003) (quoting Restatement

---

[5]    In analyzing common law nuisance claims, Maine courts have looked to the Restatement of Torts. *See, e.g., Eaton v. Cormier*, 2000 ME 65, ¶¶ 6–8, 748 A.2d 1006.

(Second) of Torts § 821B)). "Because a public nuisance affects a public right, 'ordinarily, only the State may take action against a public nuisance.' " *Higgins v. Huhtamaki, Inc.*, No. 1:21-cv-00369-NT, 2022 WL 2274876, at *8 (D. Me. June 23, 2022) (quoting *St. Hilaire*, 2003 WL 21911064, at *4 n.5). "An individual plaintiff can only bring suit if 'he has suffered some special and peculiar damages other and greater than those sustained by the public generally.' " *Id.* (quoting *Brown v. Watson*, 47 Me. 161, 162 (1859)).

Nuisances can be both public and private if, "in addition to interfering with the public right," the nuisance "also interferes with the use and enjoyment of the plaintiff's land." Restatement (Second) of Torts § 821C cmt. e. A plaintiff who succeeds on a nuisance claim at common law can obtain damages and injunctive relief. *See West v. Jewett & Noonan Transp., Inc.*, 2018 ME 98, ¶ 2, 189 A.3d 277 (compensatory damages); *Proprietors of Me. Wharf v. Proprietors of Customhouse Wharf*, 27 A. 93, 94 (Me. 1892) (injunctive relief); *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 69–70 (Iowa 2014) (surveying scholarship on common law tort remedies).

### B.   Statutory Nuisance

Maine also allows a statutory claim for nuisance. Among the "miscellaneous nuisances" recognized by statute is "[t]he . . . use of any building or place for the exercise of a trade, employment or manufacture that, by noxious exhalations, offensive smells or other annoyances, becomes injurious and dangerous to the health, comfort or property of individuals or of the public . . . ." 17 M.R.S. § 2802. Section 2701 applies to such a nuisance, *Charlton*, 2001 ME 104, ¶ 24, 774 A.2d

366, and provides: "[a]ny person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided." 17 M.R.S. § 2701.

## II.    Regulatory Framework

In 1963, Congress, concerned that common law actions and state-by-state oversight of air quality were insufficient to address the mounting threat to public health posed by air pollution, passed the Clean Air Act, Pub. L. No. 88-206, 77 Stat. 392 (codified as amended at 42 U.S.C. §§ 7401–7675). *See* 42 U.S.C. § 7401(a)(2); *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 63–64 (1975); *United States v. Gen. Motors Corp.*, 876 F.2d 1060, 1062 (1st Cir. 1989), *aff'd sub nom. Gen. Motors Corp. v. United States*, 496 U.S. 530 (1990); *Freeman*, 848 N.W.2d at 68. Although the Clean Air Act expanded the federal government's role, "the States generally retained wide latitude to determine both the air quality standards which they would meet and the period of time in which they would do so." *Train*, 421 U.S. at 64. After a disappointing response from the states, Congress overhauled the Clean Air Act in 1970 to create "a comprehensive national program that made the States and the Federal Government partners in the struggle against air pollution." *Gen. Motors Corp. v. United States*, 496 U.S. at 532; *Train*, 421 U.S. at 64.

Under the Clean Air Act's current "cooperative federalism" structure, the federal government, through the Environmental Protection Agency ("**EPA**"), develops baseline standards that the states individually implement and enforce. *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d. Cir. 2013). The EPA

develops standards under three main regulatory programs—relevant here is the New Source Performance Standards program of Section 111 ("**Section 111**").[6] *See* 42 U.S.C. § 7411; *West Virginia v. EPA*, 142 S. Ct. 2587, 2600 (2022).

Under Section 111, the EPA identifies categories of stationary sources that cause air pollution and endanger public health and establishes "standards of performance" for different pollutants emitted by those sources. *West Virginia*, 142 S. Ct. at 2601; 42 U.S.C. § 7411(b). These standards "reflect[] the degree of emission limitation achievable through the application of the best system of emission reduction." *Id.* § 7411(a)(1). As the New Source Performance Standards program name suggests, Section 111 tasks the EPA with setting standards of performance for new and modified sources. *West Virginia*, 142 S. Ct. at 2601; *see* 42 U.S.C. § 7411(b). But, under Section 111(d), once the EPA has set the standards for the pollutants from new sources, "it must then address emissions of that same pollutant by existing sources" if they are not already addressed by the Clean Air Act's other two regulatory programs. *West Virginia*, 142 S. Ct. at 2601; *see* 42 U.S.C. § 7411(d). "It does so by again determining, as when setting the new source rules, 'the best system of emission reduction that has been adequately demonstrated for existing covered facilities.'" *West Virginia*, 142 S. Ct. at 2602 (quoting 40 C.F.R. § 60.22(b)(5)). Then, the states develop and submit plans to the EPA that provide for implementing and enforcing the standards. 42 U.S.C. § 7411(d). If the plans are approved, the states are given authority to implement them. *See id.* § 7411(c).

---

[6]    The other two regulatory programs are the National Ambient Air Quality Standards program, 42 U.S.C. §§ 7408–7410, and the Hazardous Air Pollutants program, 42 U.S.C. § 7412.

Section 111(d) has only been used to establish emission standards of performance for pollutants from existing sources a "handful of times." *West Virginia*, 142 S. Ct. at 2602. This case deals with one of those times—the regulation of TRS (that is, total reduced sulfur)[7] released by kraft pulp mills. *See* Kraft Pulp Mills; Final Guideline Document, 44 Fed. Reg. 29,829 (May 22, 1979). In accordance with the Clean Air Act, Maine submitted an initial TRS control plan (the "**TRS Plan**") in 1990 and has amended it numerous times, most recently in 2004. *See* 40 C.F.R. § 62.4845 (2023). The current TRS Plan covers emissions limitations, control technologies, and planning, monitoring, and reporting requirements for kraft pulp mills. *See* 06-096 C.M.R. ch. 124, §§ 1–6. For example, no mill operator may allow venting of TRS from its low volume, high concentration collection system for longer than forty minutes or that "contributes to an aggregate TRS venting of more than 1.0% of quarterly operating time." 06-096 C.M.R. ch. 124 §§ 2–3. The EPA has approved the TRS Plan, which covers the Defendant's Old Town mill. Approval and Promulgation of Air Quality Implementation Plans; Maine; Control of Total Reduced Sulfur from Kraft Pulp Mills, 70 Fed. Reg. 9,872, 9,873–74 (Mar. 1, 2005); Approval and Promulgation of Plan for the Control of Designated Pollutants; Maine; Total Reduced Sulfur from Existing Kraft Pulp Mills, 70 Fed. Reg. 22,266-01; 40 C.F.R. § 62.4845; *id.* § 62.4925.

---

[7]    "Total reduced sulfur" refers to a mixture of compounds including hydrogen sulfide, methyl mercaptan, dimethyl sulfide, and dimethyl disulfide. Approval and Promulgation of Plan for the Control of Designated Pollutants; Maine; Total Reduced Sulfur from Existing Kraft Pulp Mills, 70 Fed. Reg. 22266, 22266 (April 29, 2005) (citations omitted).

Maine's TRS Plan is part of a wider state air pollution program, which is found in Chapter 4, Protection and Improvement of Air, of Title 38 of the Maine Revised Statutes ("**Maine's Air Quality Program**"). 38 M.R.S. §§ 581–610-D. Chapter 4 has been amended to adapt to environmental changes and keep Maine in compliance with amendments to the Clean Air Act. *See, e.g.*, P.L. 1971, ch. 570 (codified at 38 M.R.S. § 584-A) (requiring the implementation of ambient air quality standards pursuant to the Clean Air Act).

Chapter 4's Declarations of Findings and Intent section recognizes the damage caused by air pollution, expresses the Legislature's intent to create a coordinated statewide program to regulate present and future sources of emissions, and ends with this savings clause:

> Nothing in this chapter is intended, nor shall be construed, to limit, impair, abridge, create, enlarge or otherwise affect, substantively or procedurally, the right of any person to damage or other relief on account of injury to persons or property due to violation of air quality standards or emission standards and to maintain any action or other appropriate procedure therefor; nor to so affect the powers of the State to initiate, prosecute and maintain actions to abate public nuisances.

38 M.R.S. § 581.

## III.   Analysis of the Defendant's Arguments

### A.   Maine's Air Quality Program as a Potential Bar

ND OTM maintains that the Plaintiffs cannot bring their public or private nuisance claims in the absence of a regulatory violation of Maine's Air Quality Program. It advances two arguments for this contention. First, it argues that the savings clause of Section 581 prohibits private tort suits in the absence of a regulatory violation. Def.'s Mot. 3. Because the statute explicitly preserves the

private right to sue for damages "due to violation of air quality standards or emission standards" and preserves the State's right to sue for public nuisances, the Defendant argues that it should be construed to forbid citizens from filing private or public nuisance suits in the absence of any violation of the air quality laws. Def.'s Mot. 3–4.

Next, ND OTM contends that because Maine comprehensively regulates TRS pollution pursuant to federal regulations, allowing a nuisance claim in the absence of a violation of air quality or emission standards would sanction an "end-run" around "the carefully calibrated balance struck by the regulations." Def.'s Mot. 8. In support of this argument, the Defendant quotes a comment to the Restatement section on public nuisances that states: "Although it would be a nuisance at common law, conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability." Def.'s Mot. 4 (quoting Restatement (Second) Torts § 821B cmt. f.).

Assuming without deciding that ND OTM's interpretation is correct and the Maine statute does not permit a nuisance claim without a regulatory air quality violation, at this stage I cannot conclude that there has *not* been a violation of the emissions standards. Although the Defendant argues that the Complaint makes no allegations that the mill is operating out of compliance with any state or federal emissions regulations, Def.'s Mot. 7–8, the Complaint does include allegations that allow for that inference. The Complaint includes an allegation from a homeowner who states that in the thirty-six years that he has lived near the mill it has "never

smelled so bad." Compl. ¶ 31. Further, the Complaint alleges that there have been at least fifty distinct complaints since 2020. Compl. ¶ 32(c). The TRS Plan, which was last amended in 2004, is supposed to be based on emissions levels achievable from "the best system of emission reduction that has been adequately demonstrated for existing covered facilities." *West Virginia*, 142 S. Ct. at 2602. It makes little sense that the conditions would have gotten worse since the TRS Plan's last amendment in 2004. It is a plausible inference—if complaints are on the rise and the smell is worse than it has been in decades—that a violation of the emissions standards is involved.

In addition, the Plaintiffs have alleged that ND OTM has been negligent in its operations, Compl. ¶¶ 24–25, 41–43, 59, 61, 80–81, and the Complaint does not allege that there have been no violations of the emissions standards. It is not clear to me, based on the allegations of the Complaint and the briefing by the parties, how findings of noncompliance would be made by the State or whether and how they would be published. It may well be that the Plaintiffs are not in a position to know whether ND OTM's TRS emissions have violated regulations. Further, there is nothing in the Complaint that shines a light on how the State monitors compliance with the TRS Plan. Even if ND OTM has never been "found" to be out of compliance by the State, that does not necessarily mean that it has never actually been out of compliance. Finally, as the Plaintiffs point out, it cannot be inferred from the Complaint that TRS is the sole pollutant at issue. Pls.' Resp. at 6. Whether ND OTM has exceeded the standards for sulfur emissions or whether something

else has caused the odor problem to worsen are open questions that may become clearer after discovery. At this stage, dismissing the nuisance claim on the grounds that the Plaintiffs have not alleged a regulatory violation is premature.

### B.    The Special Injury Requirement

ND OTM further contends that the Plaintiffs cannot bring their public nuisance claim because they have not suffered a sufficient special injury. Def.'s Mot. 8. The Plaintiffs counter that their allegations of special harm involving "the use and enjoyment of their land and property, deprivation of the full value of their property, and decreased property values" constitute special damages and set them apart from members of the larger community. *See* Compl. ¶ 70; Pl.'s Resp. 14.

Just what constitutes "special and peculiar" damages, has proven to be slipperier than an eel in an oil spill. And on similar facts to those alleged here, courts have gone in different directions. *Compare Baptiste v. Bethlehem Landfill Co.,* 965 F.3d 214, 221–22 (3d Cir. 2020) (public nuisance actionable by class of residents to abate noxious odors from landfill),[8] *with Davies v. S.A. Dunn & Co.,* 200

---

[8]    In *Baptiste*, a public nuisance odor case survived a motion to dismiss because the plaintiffs had alleged infringements of two distinct rights—the non-possessory public right to clean air and their private rights to use and enjoy their homes and property. 965 F.3d at 221. The Third Circuit explained that there was a difference between the harm suffered by "everyone in the community— including visitors, commuters and residents alike—. . . from the discomfort of having to breathe polluted air in public spaces" and the harms to the plaintiffs' property values and ability to use and enjoy their land. *Id. Baptiste* seems to reflect the view of the majority of courts to have considered the question. *See also Agudelo v. Sprague Operating Res., LLC,* 528 F. Supp. 3d 10, 14–15 (D.R.I. 2021); *Thornburgh v. Ford Motor Co.,* No. 4:19-cv-01025-HFS, 2021 WL 1230271, at *3–4 (W.D. Mo. Mar. 31, 2021); *Diaz v. Darling Ingredients Inc.,* No. 20-cv-01259-CMA-SKC, 2021 WL 1172620, at *7 (D. Colo. Mar. 29, 2021); *Sines v. Darling Ingredients Inc.,* No. 19-19121 (CCC), 2020 WL 5015488, at *2 (D.N.J. Aug. 25, 2020); *Fresh Air for the Eastside, Inc. v. Waste Mgmt. of N.Y., L.L.C.,* 405 F. Supp 3d 408, 443–44 (W.D.N.Y. 2019); *Johnson v. Big Ox Energy, LLC,* No. 8:19-CV-10, 2019 WL 13223867, at *3 (D. Neb. Aug. 27, 2019); *Keech v. Sanimax USA, LLC,* No. 18-683 (jrt/hb), 2019 WL 79005, at *3 (D. Minn. Jan. 2, 2019); *Woods v. U.S. Steel Corp.,* No. 2:17-cv-00883-RDP, 2018 WL 6067502, at *11 (N.D. Ala. Nov. 20, 2018); *Beck v. Stony Hollow Landfill, Inc.,* No. 3:16-cv-455, 2017

A.D.3d 8, 13–16 (N.Y. App. Div. 2021) (dismissing public nuisance claim by class of residents affected by noxious odors from landfill for failure to establish special injury different from the community at large).[9]

Here, I must apply Maine law, and a brief trip through Maine's public nuisance case law provides the guiding principles required to analyze this case. For over 164 years, the Maine Supreme Judicial Court, sitting as the Law Court, has been saying: "The law is well settled, that no person can maintain an action for a common nuisance, unless he has suffered therefrom some special and peculiar damages other and greater than those sustained by the public generally." *Brown v. Watson*, 47 Me. 161, 162 (1859).

In *Smedberg v. Moxie Dam Co.*, 148 Me. 302, 92 A.2d 606 (1952), the plaintiff, an owner of a hotel and sporting camps near, but not on, Lake Moxie, complained that a dam operator was maintaining a public nuisance by improperly regulating the waters of Lake Moxie thus wreaking havoc with the fishing conditions. *Id.* at 303–04, 92 A.2d at 607. The court framed the inquiry as whether the plaintiff "suffer[ed] an injury different in kind from the injury to the public" and whether the

---

WL 1551216, at *3–4 (S.D. Ohio May 1, 2017); *Willmschen v. Trinity Lakes Improvement Ass'n*, 840 N.E.2d 1275, 1282–83 (Ill. App. Ct. 2005); *Soap Corp. of Am. v. Reynolds*, 178 F.2d 503, 506 (5th Cir. 1949).

[9]     In *Davies*, the New York Supreme Court, Appellate Division, dismissed a public nuisance claim that alleged the "noxious odors emanating from the landfill . . . interfered with [plaintiffs'] ability to use and enjoy their properties and have resulted in a diminution in their property values." 200 A.D.3d at 15–16. The court took a more limited view of the general public and found that the relevant community consisted of "the other homeowners and renters impacted by the landfill's odors." *Id.* at 15. The *Davies* court concluded that the plaintiffs failed to show special damages because the "alleged harm is essentially the same for all of the residents in the nearby vicinity of the landfill—i.e., the community at large." *Id.* at 16; *see also Duncan v. Cap. Region Landfills, Inc.*, 152 N.Y.S.3d 862, 863 (N.Y. App. Div. 2021); *Town of Rome City v. King*, 450 N.E.2d 72, 78 (Ind. Ct. App. 1983).

plaintiff showed "a special, peculiar, distinct, and private injury." *Id.* at 305, 92 A.2d at 608. The *Smedburg* court zeroed in on whether the plaintiff had shown an infringement of his private rights.

> The true test seems to be whether the injury complained of is the violation of an individual right, or merely a hindrance to the plaintiff in the enjoyment of the public right. . . .
>
> We conclude that the complaint at best from the viewpoint of the plaintiff shows a hindrance only to the plaintiff and his guests, as individuals, in their enjoyment of a public right. Such a hindrance does not affect a private right of the plaintiff.

*Id.* at 310, 92 A.2d at 610 (internal citation and quotation marks omitted). The *Smedburg* court concluded that only the State had "the right to complain against acts of the defendant which may constitute a public nuisance." *Id.* at 311, 92 A.2d at 610.

In *Burgess v. M/V Tamano*, 370 F. Supp. 247 (D. Me. 1973), three classes of plaintiffs—commercial fishermen, commercial clam diggers, and owners of businesses in Old Orchard Beach—brought a public nuisance claim seeking damages for loss of profits and impairment of earning capacity sustained after an oil spill in Casco Bay. *Id.* at 248–49. The defendants moved to dismiss on the ground that none of the classes had any property interest in the coastal waters and marine life or shores injured by the spill. *Id.* at 250. As to the fishermen and clam diggers, the court identified as a public right as the "right to fish or to harvest clams in Maine's coastal waters." *Id.* at 249–50. In ascertaining whether the fishermen and clam diggers had special damages, the court found a special interest, apart from the public in general, to take fish and harvest clams. "The injury of which they

complain has resulted from defendants' alleged interference with *their* direct exercise of the public right to fish and to dig clams." *Id.* at 250. The court applied the "general principle that pecuniary loss to the plaintiff will be regarded as different in kind 'where the plaintiff has an established business making a commercial use of the public right with which the defendant interferes.' " *Id.* (quoting William L. Prosser, *Law of Torts*, § 88 at 590 (4th ed. 1971)). Citing *Smedberg*, the court took a different view of the claims made by the businesses in Old Orchard Beach because

> [u]nlike the commercial fishermen and clam diggers, the Old Orchard Beach businessmen do not assert any interference with *their* direct exercise of a public right. They complain only of loss of customers indirectly resulting from alleged pollution of the coastal waters and beaches in which they do not have a property interest. Although in some instances their damage may be greater in degree, the injury of which they complain, which is derivative from that of the public at large, is common to all businesses and residents of the Old Orchard Beach area. In such circumstances, the line is drawn and the courts have consistently denied recovery.

*Id.* at 250–51. Because the Old Orchard Beach businesses could "show no such distinct harm from the oil spill" their claims were dismissed. *Id.* at 251.

In *Hanlin Group, Inc. v. International Minerals & Chemical Corp.*, 759 F. Supp. 925 (D. Me. 1990), the owner of a chemical plant sued its predecessor for costs associated with the cleanup of mercury and other contaminants that had been discharged into the Penobscot River during the period the plant was owned by the predecessor. *Id.* at 928. The plaintiff brought both private[10] and public nuisance

---

[10]    This Court dismissed the plaintiff's private nuisance claim reasoning that a private nuisance claim lies "where the defendant's use of its land causes a continuing injury to adjoining or

claims. *Id.* at 934–35. As to the public nuisance claim, the court found that Hanlin had sufficiently alleged "the violation of or interference with a public right" and focused on whether Hanlin had sufficiently alleged that it had "suffered, in the exercise of that public right, an injury different in kind from that sustained by the public generally." *Id.* at 936. Hanlin argued that the loss of property value and impairment of its right to use and enjoy its property was sufficient to meet the special injury requirement. *Id*. But this Court disagreed. Finding no Maine case that had addressed "whether either response costs or loss of enjoyment and use of land alleges a distinct harm suffered in the exercise of a public right," the Court relied on *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303 (3d Cir. 1985), and its progeny. *Hanlin*, 759 F. Supp. at 936–37 (citing *Phila. Elec. Co.,* 762 F.2d at 315–16, *cert. denied*, 474 U.S. 980 (1985)). *Philadelphia Electric* had a similar fact pattern to *Hanlin*, and there the Third Circuit found that expenses incurred in cleaning up the pollution of a successor corporation were not suffered while "exercising the right common to the general public that was the subject of interference." *Phila. Elec.,* 762 F.2d at 316. Or as the Third Circuit put it:

> [Plaintiff] does not allege that it used the waters of the Delaware River itself, or that it was directly harmed in any way by the pollution of those waters. Thus, this is not a case "where an established business made commercial use of the public right with which the defendant interfered." If [Plaintiff]—as a riparian landowner—had suffered damage to its land or its operations as a result of the pollution of the Delaware, it would possibly have a claim for public nuisance. But the condition of the Chester site was not the *result* of the pollution, it was the *cause* of it. [The Pennsylvania Department of Environmental

---

neighboring land" and does not cover disputes between successive landowners. *Hanlin Group, Inc. v. International Minerals & Chemical Corp.*, 759 F. Supp. 925, 935 (D. Me. 1990).

> Resources] required [Plaintiff], as owner of the Chester site, to remove
> the sources of the pollution. [Plaintiff] has been specially harmed only
> in the exercise of its private property rights over the Chester site.

*Id.* (internal citation omitted) In *Hanlin*, this Court noted that the plaintiff had

alleged nothing more than the plaintiffs in *Philadelphia Electric* and its progeny,

and it concluded that Hanlin lacked standing to bring a public nuisance claim. *Id.*

Since *Hanlin,* the Law Court decided *Charlton*, in which a husband and wife

sued their neighbor for building (and the town of Oxford for allowing the neighbor to

build) a waterfront home in violation of multiple municipal land use ordinances.

2001 ME 104, ¶¶ 2, 5–6, 774 A.2d 366. After a bench trial, the lower court denied

the Charlton's claims, one of which was for a public nuisance. *Id.* ¶¶ 1–2, 774 A.2d

366. In affirming the denial of the public nuisance claim, the Law Court wrote:

> The Charltons did not produce evidence to establish that they have
> suffered any pecuniary loss, or injuries, to their person or property
> because of [the neighbor's] land use violations.
>
> . . . .
>
> In this case, . . . it is not that the Charltons have suffered a *nominal* or
> *de minimis* injury, rather, it is that they have not suffered a
> quantifiable injury, such that the value of their property has been
> diminished or that the [neighbor's] property has interfered with the
> use and enjoyment of their property. Moreover, "when defendant's
> conduct involves mere physical discomfort or mental annoyance, there
> is somewhat more difficulty in deciding when the interference is
> substantial and unreasonable justifying a recovery for damages.
> Probably a good working rule would be that the annoyance cannot
> amount to unreasonable interference until it results in a depreciation
> in the market or rental value of the land."

*Id.* at ¶¶ 31, 34 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of*

*Torts*, § 88 at 627 (5th ed. 1984)).

In *Higgins v. Huhtamaki, Inc.*, No. 1:21-cv-00369-NT, 2022 WL 2274876 (D. Me. June 23, 2022), I denied a motion to dismiss a public nuisance claim brought by a class of Maine landowners against various paper companies for damages that allegedly arose out of the disposal of wastewater and biosolids that were contaminated with PFAS. *Id.* at *1–3. I concluded that the plaintiffs' costs of having to remove the PFAS from their properties was a sufficient allegation of special damages distinct in kind and degree from the harm suffered by the general public. *Id.* at *9. As I laid out the law, I cited *Hanlin* for the proposition that "losses in property value or the right to use and enjoy one's property" are not special injuries. *Id.* at *8 (citing *Hanlin,* 759 F. Supp. at 936). I should not have spoken so broadly. Although the court in *Hanlin* found that the plaintiff's claim of diminution of property value and impairment of the right to use its property did not meet the special injury requirement, that conclusion was based on the fact that Hanlin did not allege that it was injured while exercising the public right.

Several lessons emerge from this lineup of authority. In order for private parties to state claims for a public nuisance, they must allege damage to a right peculiar to themselves that is *directly* attributable to the defendant's violation of the public right at issue. *Smedburg* and *Burgess* teach that pecuniary loss is sufficient if it flows directly from the violation of the public right, but it will not suffice if it is suffered derivatively or indirectly. The alleged loss must be distinct from the loss suffered by the public at large. *Charlton* strongly suggests that a property owner who alleges diminution in property value arising directly from a violation of a public

right that is distinct from the public at large has sufficiently stated a claim for public nuisance. And *Hanlin* shows that merely alleging injury to the use and enjoyment of property is not enough if the plaintiff is not injured while exercising the public right.

Here, the Plaintiffs allege that the public right is the right to breathe uncontaminated and unpolluted air in public spaces. Compl. ¶ 67. The Plaintiffs further allege that the Defendants have violated that public right by emitting noxious odors and polluting the air. Compl. ¶¶ 68–69. The Plaintiffs allege that the Defendant's violation of the public right has caused the public—"businesses, employees, commuters, tourists, visitors, customers, clients, and students"—to breathe the unclean air and noxious odors and has impacted a wide range of commercial and recreational activities in public spaces. Compl. ¶ 40. The Plaintiffs allege that they have suffered this harm in common with other members of the public. Compl. ¶ 40. But, crucially, they allege that the Defendants' violation of the public right has also impacted their private rights as landowners and occupants through diminished property values and interference with their use and enjoyment of property. Compl. ¶¶ 62–66. The path from the Defendant's emissions to the Plaintiffs' harm is direct and not derivative, and the Plaintiffs' allegations show that the harms they allege are harms suffered while exercising the public right. Whether they can prove their allegations remains to be seen, but the allegations are sufficient to state a claim for public nuisance.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendant's motion to dismiss (ECF No. 11). The motion to dismiss the Plaintiffs' trespass claim is **GRANTED** and Count II is **DISMISSED**; the motion to dismiss the Plaintiffs' nuisance claims, Count I, is **DENIED**.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 12th day of September, 2023.